UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 5:20-cr-128-DCR-MAS-1 |
| v. | ) | |
| | ) | |
| RUBEN A. MOLINA, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT & RECOMMENDATION

Defendant Ruben Molina ("Molina") is currently charged with conspiracy to distribute large quantities of methamphetamine both in October and November 2020. Molina's motion to suppress, however, concerns a search conducted in response to an overdose incident at his residence in January 2020. Specifically, Molina moves to suppress all evidence discovered during (1) a protective sweep conducted by officers responding to the overdose incident; (2) execution of a subsequently obtained state search warrant for his residence; and (3) review of a cell phone pursuant to a second, subsequent search warrant. [DE 85]. Molina contends that evidence obtained during these searches indirectly relates to the current prosecution.

Following full briefing and two days of evidentiary hearings,[1] the Court recommends denial of Molina's suppression motion because not only was the evidence procured properly and legally, but there is no relevance of any such evidence to the current prosecution.

---

[1] For citation purposes, the Court references the transcript of the June 8, 2021 hearing as the "June 8 Tr." and that of the June 11, 2021 hearing as the "June 11 Tr."

1

# I.  FACTUAL & PROCEDURAL BACKGROUND

## A.  OVERDOSE INCIDENT

On the afternoon of January 19, 2020, officers responded to a reported overdose incident at 3861 Ormesby Place in Lexington, Kentucky.  Upon arrival, emergency responders found and began treating three individuals suffering from apparent drug overdoses: (1) Ulises Duarte; (2) Nathanael Morales; and (3) Ruben Corrales.  Body camera footage of various law enforcement personnel demonstrated that the home appeared to be very large, with an open two-story great room and several different rooms upstairs as well as a basement.  The impaired individuals were all positioned throughout the living room and dining room area on the first floor of the large residence.  As officers administered multiple doses Narcan to the overdosing victims, Molina, who appeared unimpaired, wandered throughout the first floor of the home while using his cellphone.

While paramedics were still treating at least two of the overdosed individuals, officers began arriving on-scene.[2]  Lexington Police Department Officer Rebecca Saylor ("Officer Saylor") was the first to arrive.  [June 8 Tr. at 88; *see also* DE 108 (conventional filing of Officer Saylor's body camera footage)].  Lexington Police Department Officer Chaz Grider ("Officer Grider") and Officer Clipson (first name unmentioned) arrived soon after.  [*Id.* at 94–95].  Officer Saylor, as Corrales sat on the living room couch still recovering, began asking Corrales questions as to the cause of his illness.  Corrales reported that he had consumed too much alcohol.  [*Id.* at 89–90].  Officer Saylor next spoke with Molina.  After eliciting Molina's basic details (including his name and residence, which he confirmed was the Ormesby Place home), Officer Saylor asked

---

[2] It is not entirely clear whether the third overdose victim had yet been transported to the hospital when officers began to arrive.  He was absent, at least, by the time Sergeant Jared arrived. [June 8 Tr. at 12].  The remaining two victims declined transport to the hospital and remained at the residence throughout.

Molina whether she could search "the bathrooms and stuff." [*Id.* at 90–91; DE 108]. Molina responded that Officer Saylor could "go ahead." [June 8 Tr. at 91]. Upon searching the bathroom nearest the living room on the main floor of the home, Officer Saylor located suspected marijuana in a translucent, orange pill bottle in plain view on the bathroom countertop. [*Id.*]. Molina advised that he did not know whose marijuana it was, but that the bathroom was typically used by his sister, who was not present at the residence. [DE 108]. Officer Saylor testified that, after locating the marijuana, she and the other officers remained on the main floor of the residence and maintained "visual accountability" of the home's occupants until other units arrived and a more thorough sweep of the residence could be conducted. [June 8 Tr. at 95]. Per Officer Saylor, overdose victims frequently awaken in a disoriented and, at times, violent state. Consequently, she felt it unsafe to leave the main area of the home until it was definitively secured. [*Id.*].

Lexington Police Department Sergeant Brian Jared ("Sergeant Jared") arrived next. [*Id.* at 8–10]. Upon entry into the garage, Officer Grider advised Sergent Jared that he suspected narcotics activity at the home. [*Id.* at 10–15]. At this point, Officer Grider informed Sergeant Jared that two individuals were inside of the residence being treated for overdoses, and a third (later confirmed to be Morales) had been transported to the hospital. [*Id.*]. Immediately inside of the entryway from the garage to the home, Sergeant Jared noticed an industrial tape gun (for taping boxes) and an open, large black trash bag with latex gloves clearly visible inside and at the top of it. [*Id.*]. Inside, in the kitchen area, Sergeant Jared noticed Molina seated at the kitchen table. [*Id.*]. He then asked the on-scene officers whether they had searched the entire home for potential overdose victims and/or children or other persons that may be left alone in the home if the adults on the main floor were transported to the hospital or elsewhere. [*Id.* at 14–20].

3

Learning that the officers present had not searched the entire house, Sergeant Jared directed them to do so. [*Id.*]. Sergeant Jared joined the effort and briefly looked into each upstairs room. [*Id.* at 17 ("I figured that everyone's probably checked the main floor so I went and made my way up the stairs and just stuck my head into each individual room just to make sure there's no one obviously laying in a bed or down in the bathroom or in the hallway for that matter.")]. Sergeant Jared found no persons. However, while sweeping the basement, Sergeant Jared immediately noticed a pile of large black trash bags collected in one corner, as well as marijuana paraphernalia (burnt marijuana cigarettes) all in plain view in the room. [*Id.* at 16–17]. He confirmed that he did not have to move or manipulate any objects to see the items. Back on the main floor, in the kitchen/living room area, Sergeant Jared further noticed a large box of latex gloves in plain view on a desk located in the kitchen. [*Id.* at 18 ("There's a little nook [in the kitchen], such as this podium, that most houses have as a mini office and there was a large box of latex gloves sitting there as well.")].

Lexington Police Department Detective Brian Cobb ("Detective Cobb") arrived at the residence next. He initially consulted with Officer Grider and Sergeant Jared in the kitchen area of the home. [*Id.* at 38]. At this point, Corrales and Duarte were still in various stages of recovery, clearly ill and clutching vomit bags. [*Id.* at 38–45]. Detective Cobb immediately noticed half-eaten plates of breakfast food from First Watch on the kitchen island. Per Detective Cobb, "Mr. Molina advised that he left to go buy breakfast, when he returned home with the food the three subjects . . . were laying on the floor, that's when he called 911 for emergency services." [*Id.* at 41]. Detective Cobb found this timeline suspicious, given the already-half-eaten plates of food. [*Id.*]. Officers further advised Detective Cobb that Officer Saylor had found marijuana in the

4

house.  Additionally, in the dining room directly adjoining the kitchen and living room areas on the main floor, Detective Cobb observed wet streaks on the dining room table, consistent with it having recently been wiped down in specific places.  [*Id.* at 43].  Duarte, still recovering with paramedic assistance, was seated on the floor by the dining room table.

## B.  SUBSEQUENT SEARCH WARRANT FOR THE RESIDENCE AND CELL PHONES

Based upon his and other law enforcements observations at the residence, Detective Cobb sought a search warrant for the Ormesby Place residence.  [*Id.*].  In the affidavit, Detective Cobb described the emergency call to the residence in response to a suspected triple overdose, as well as the individuals' eventual revival with numerous doses of Narcan.  [DE 85-1 at Page ID # 378].  Although Detective Cobb explained to Molina that Narcan was effective only on opioids, Molina denied any narcotics use in the home.  [*Id.*].  Detective Cobb also included in the affidavit the items found during the sweep of the residence: the pile of trash bags collected inside of the home and not disposed in exterior trash cans; the discarded latex gloves and the full box of latex gloves; the industrial tape dispenser; the marijuana in the bathroom; the strong odor of marijuana; the drug paraphernalia; and burnt marijuana cigarettes.  [*Id.*].  Detective Cobb also noted the recently wiped-down table as consistent with an attempt to conceal narcotics use.  [*Id.*].

Additionally, the affidavit mentioned two security cameras on the outside of the residence, a trail camera mounted in a tree in the median near the entrance to the neighborhood, and a large sum of cash as well as three cell phones located on Molina's person.  [*Id.*].  Detective Cobb stated that "Officer Grider had to forcibly detain Ruben Molina and remove one of the cell phones from him as he began deleting text messages from the phone."  [*Id.*].  The affidavit also referenced the Ormesby Place occupants' criminal histories, including Corrales's prior marijuana and cocaine trafficking charges, and Molina's several prior trafficking charges (at least one involving fentanyl)

and prior service of a federal sentence.  [*Id.*].  Lastly, Detective Cobb affirmed that, during a neighborhood canvass, neighbors complained of the smell of marijuana coming from the house and significant come-and-go traffic to the residence.  [*Id.*].

Based on these facts, the search warrant was approved and executed around 6:45 p.m. that same evening.  [*Id.* at Page ID # 375].  Law enforcement uncovered evidence of drug trafficking (including packaging materials and multiple pounds of marijuana, *see* DE 1-1 at Page ID # 3–4).  In addition to the drug-related items, law enforcement seized seven cell phones from Molina, Duarte, Morales, and Corrales.  Two days after the overdose incident and search of the Ormesby Place residence, law enforcement obtained search warrants for each of those phones.  [DE 113].  A cellebrite report was eventually prepared for each phone.  [*Id.*].

## C.    ALLEGED RELEVANCE TO CURRENT CHARGES

By the conclusion of the June 8th suppression hearing, the parties disagreed upon what relevance, if any, the seized evidence had upon the current charges.  Molina initially postured that information obtained from a cellebrite report on his phone directly led the United States to the confidential informant used to purchase the methamphetamine in October and November 2020.  Molina supported this argument referencing an investigation note suggesting as much.[3]  The United States denied such a connection and explained that Molina was misreading the investigation note.

On June 11, 2021, the suppression hearing resumed with Drug Enforcement Agency ("DEA") Special Agent Jason Moore ("Special Agent Moore").  [June 11 Tr.].  Special Agent Moore testified that the DEA began its investigation of Molina in late 2019.  The DEA had no

---

[3] The investigation note was neither submitted into evidence nor provided to the Court for review.

preceding knowledge of the Lexington law enforcement investigation surrounding the overdose incident in January 2020. In the early summer of 2020, the DEA began working with a confidential source ("CS"). [*Id.* at 6–8]. There is no indication on the current record that the Lexington Police Department or DEA learned of the CS through either the phones or any other evidence seized on (or as a result of) the January 19 events specifically.

In the early fall of 2020, Molina contacted the CS about a possible drug transaction and provided the CS with a phone number for contact. Then, and only then, the DEA used the previously obtained cellebrite reports created by Lexington law enforcement to verify the number provided by Molina as one previously associated with Molina. [*Id.* at 9]. More specifically, the DEA used the cellebrite report from the cell phone of Morales where the phone number was listed as part of Molina's contact information. Thus, while investigators did use the cellebrite reports, Special Agent Moore testified that the information from the phone itself provided no meaningful value in the investigation as the pending controlled buys were well in motion.

## II.    ANALYSIS

Molina advances four specific challenges to the January 19, 2020 search and its resulting fruits. He argues: (1) that the protective sweep was invalid, and that any evidence uncovered during it must be excised from the affidavit and eliminated from the residential search warrant's probable cause calculus; (2) that any statements Molina made on January 19th prior to law enforcement obtaining the search warrant were elicited in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966) and must be excised from the search warrant's affidavit; (3) that, with all offending facts excised, the search warrant was unsupported by probable cause, and not even the good faith exception saves it; and (4) that the Court should suppress any evidence found during a later search of Morales's cell phone that law enforcement seized on January 19th.

The Court carefully addresses, and ultimately rejects, each argument in turn.

**A.    THE PROTECTIVE SWEEP HAD A VALID PURPOSE AND WAS REASONABLE IN SCOPE AND DURATION.**

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[,]" and it provides that "no warrants shall issue, but upon probable cause, . . . and particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const. amend IV.  It is a "basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006) (quotation marks omitted).  "Nevertheless, because the ultimate touchstone of the Fourth Amendment is 'reasonableness,' the warrant requirement is subject to certain exceptions." *Id.*  One such exception applies when exigent circumstances "make the needs of law enforcement so compelling that the warrantless search is objectively reasonable." *Michigan v. Fisher*, 558 U.S. 45, 47 (2009) (quoting *Mincey v. Arizona*, 437 U.S. 385, 393–394 (1978)).  "[F]our situations may give rise to exigent circumstances: (1) hot pursuit of a fleeing felon, (2) imminent destruction of evidence, (3) the need to prevent a suspect's escape, and (4) a risk of danger to the police or others." *Thacker v. City of Columbus*, 328 F.3d 244, 253 (6th Cir. 2003).

Falling into the fourth category, "[o]ne exigency obviating the requirement of a warrant is the need to assist persons who are seriously injured or threatened with such injury." *Brigham City*, 547 U.S. at 403.  "[T]he Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid." *Thacker*, 328 F.3d at 253 (quoting *Mincey*, 437 U.S. at 392).  In other words, "[t]he need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal

8

absent an exigency or emergency." *Mincey*, 437 U.S. at 392. Such a search intended to locate those presenting danger to on-scene officers or individuals in need of emergency assistance is considered a permissible "protective sweep" of the premises. *See Stricker v. Twp. of Cambridge*, 710 F.3d 350, 361–62 (6th Cir. 2013). A valid protective sweep for emergency aid purposes requires "an objectively reasonable basis for believing . . . that a person within [the house] is in need of immediate aid[.]" *Fisher*, 558 U.S. at 47 (quotation marks and citations omitted). The officers' subjective intent and the seriousness of any crime they might suspect is irrelevant to the analysis. *Id.* Relatedly, a valid protective sweep for officer safety purposes requires facts that "would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Wilson v. Morgan*, 477 F.3d 326, 338 (6th Cir. 2007). In either scenario, "[t]he sweep may extend only to those places a person may be found and may last only as long as necessary to dispel the reasonable suspicion of danger." *Id.* (quotation marks omitted). When engaged in a valid protective sweep and thus lawfully on the premises, "the police may seize any evidence that is in plain view during the course of their legitimate emergency activities." *Mincey*, 427 U.S. at 393; *see also United States v. Galaviz*, 645 F.3d 347, 355 (6th Cir. 2011) ("Under the plain-view doctrine, if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant.") (quotation marks omitted).

Molina does not explicitly challenge the stated bases for the protective sweep in this case— to confirm that there were no additional overdose victims, unmonitored minors who may be alone and in danger, or threats to police safety in the home. Certainly, the undisputed facts support the

9

necessity of the protective sweep. The adults on the main floor were evasive and dishonest when officers questioned them about the circumstances of the overdoses. For example, Molina denied that the individuals had taken any narcotics; the overdosed and recovering individual seated on the living room couch just revived via several doses of Narcan advised Officer Saylor that he had consumed only alcohol the night before. [DE 108 (body camera footage); DE 85 1 at Page ID # 378; June 8 Tr. at 89]. Two of the recovering individuals refused to go to the hospital for treatment, despite the paramedics' pleading. [June 8 Tr. at 22]. Accordingly, it was objectively reasonable for the officers to view a house-wide sweep as necessary to ensure there were not adults or children needing assistance located in other areas throughout the home.[4]

Nor does Molina take issue with the scope. The record demonstrates that each officer involved in the sweep simply peeked into the various rooms and merely surveyed what was in plain view.[5] [See, e.g., June 8 Tr. at 17 (Sergeant Jared testifying that he only "just stuck [his]

---

[4] The Court does not base its finding of protective sweep need on the Government's secondary officer safety theory. By the time even the first officer (Officer Saylor) arrived on-scene, the paramedics had been treating the individuals present for at least long enough to revive two of the victims and send the third to the hospital. There had been no indication of any danger or threat to the paramedics or other law enforcement, and Officer Saylor did not even conduct a sweep immediately upon her arrival on the premises. By the time any officer conducted what could be considered a protective sweep, there was no longer any objectively reasonable fear of danger to the responders, and thus no legitimate need for a protective sweep on that basis. Relatedly, though there is at least some evidence that Sergeant Jared was in fact anticipating that he might find some evidence of narcotics activity during the sweep [see June 8 Tr. at 12 (testifying that Officer Grider had advised him there might be evidence of narcotics activity in the home)], his subjective intent is irrelevant. See Brigham City, 547 U.S. at 403–05.

[5] Molina does not argue, and the record does not suggest, that officers searched through drawers—or did anything beyond glancing through the rooms—during any part of the protective sweep. Officer Saylor looked through the drawers in the bathrooms, but neither party disputes that she had consent to search (at least) the bathrooms themselves. [June 8 Tr. at 97]. And regardless, as in Stricker, searching through bathroom drawers and cabinets would be objectively reasonable in the circumstances in order to investigate what substances the overdose victims had consumed, given the occupants' untruthful and implausible answers. In any event, it does not appear that any

head into each individual room just to make sure there's no one obviously laying in a bed or down in the bathroom or in the hallway for that matter")].  The Court finds the scope of the search consistent with the exigencies it sought to address.  *See Wilson*, 477 F.3d at 338 (6th Cir. 2007) (finding that such a sweep should "extend only to those places a person may be found"); *Stricker*, 710 F.3d 350, 361–62 (concluding that where "it was objectively reasonable for the officers to believe that Andrew was suffering from a drug overdose and that the Strickers attempted to hide the drug overdose from the police, a search around the bedrooms and even into the drawers" was warranted).

Molina does, however, challenge the duration of the sweep.  Indeed, the sweep in this case was piecemeal and somewhat disorganized, undoubtedly temporally extending it to some degree.  But the touchstone of the Fourth Amendment is not perfection; it is reasonableness.  The central question is simply whether the duration of the sweep was reasonably and continuously tied to the exigency itself.  As noted, the sweep may not last any longer than is reasonably necessary to confirm that the suspected danger has subsided.  *Wilson*, 477 F.3d at 338.  Given the primary "reasonableness" inquiry, the case law offers few bright-line outer timing limits.  The answer necessarily turns on the specific facts in each scenario.

Here, Officer Saylor was the first police officer (separate from the fire department and paramedics) to arrive on the scene.  Per Officer Saylor' testimony, she arrived through the garage [*see* DE 108] where she observed in plain view the open trash bag with plastic gloves visible inside.  The scene was chaotic, with multiple overdose victims located in different rooms across the main floor of the home.  She then requested and obtained Molina's consent to search the bathrooms.

---

incriminating evidence was discovered in the bathroom drawers, and Molina specifically references none.

11

[June 8 Tr. at 90–91]. In the bathroom, Officer Saylor located marijuana. [DE 108]. Sergeant Jared, following Officers Grider and Clipson, arrived next. [DE 85-1, at Page ID # 377; June 8 Tr. at 10]. As he was entering the residence, Sergeant Jared saw an industrial tape gun and the open trash bag with latex gloves in plain view. [*Id.* at 12]. In plain view in the kitchen area (specifically, in a nook seemingly designated as a small office space), Sergeant Jared noticed a box of latex gloves. [*Id.* at 18]. Sergeant Jared then immediately ordered a protective swept of the entire home to ensure there were no additional victims or persons in the home. [*Id.* at 15–16]. In the basement, he saw in plain view a pile of large trash bags collected in one corner of the room as well as burned marijuana cigarettes. [June 8 Tr. at 16].

The sweep of the residence, at all times, was targeted to ensure that no additional overdose victims or minors were located inside. [*See id.* at 17]. *Cf. Mincey,* 437 U.S. at 392–93 (cautioning that a warrantless search must at all times remain "strictly circumscribed by the exigencies which justify its initiation" and finding that, in a situation where all persons in the home had already definitively been located, a subsequent "a four-day search that included opening dresser drawers and ripping up carpets [could] hardly be rationalized in terms of the legitimate concerns that justify an emergency search"). In contrast with the *Mincey* search, Sergeant Jared and the others in this case reasonably believed that the legitimate need for the sweep persisted throughout its entire duration. *See Wilson*, 477 F.3d at 338. Consequently, the duration was reasonable. And, as everything located during the sweep was unequivocally discovered in plain view, the suppression of the viewed evidence is unwarranted. The Court need not excise any uncovered proof from the resulting search warrant affidavit.

**B.**    **MOLINA HAS NOT SHOWN THAT ANY STATEMENTS SHOULD BE SUPPRESSED.**

Molina vaguely argues that the Court should suppress statements that Molina made to law enforcement during emergency responders' treatment of the overdose victims.  It is not at all clear, however, which specific statements Molina challenges.[6]  Regardless, the Court finds that Molina has not shown that he was subject to custodial interrogation during the relevant period. Accordingly, the Court recommends denial of Molina's motion to the extent it can be construed to seek suppression of any statements that Molina made on January 19, 2020.

The Fifth Amendment precludes an individual from being "compelled in any criminal case to be a witness against himself."  U.S. Const. amend. V.  To help safeguard this right, the Supreme Court enacted the familiar prophylactic rule outlined in *Miranda*: "Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed."  384 U.S. at 444.  The *Miranda* rule applies only to custodial interrogations—*i.e.*, "questioning by a law enforcement officer after a person has been taken into custody or otherwise deprived of his freedom of action in a significant way." *Maranian v. Jackson*, 14 F. App'x 310, 313 (6th Cir. 2001).  To determine whether there was a custodial interrogation, the Court "examines the totality of the circumstances to determine how a reasonable man in the suspect's position would have understood his situation" and whether "a restraint on freedom of

---

[6] The briefing does not address or request suppression of any particular statements.  During the first hearing on June 8, defense counsel briefly questioned Detective Cobb about the Mirandization and subsequent questioning of Molina, without referencing any specific statements or responses themselves.  At the June 11 follow-up hearing, the Court asked Defendant whether he intended to argue that any statements should be suppressed. Again without identifying specific statements, Defendant confirmed that "to the extent [Molina] provided responses" to Detective Cobb's questions, he intended to seek suppression of them.

movement of the degree associated with a formal arrest" occurred. *Id.* at 314. "A suspect is in custody if, under the totality of the circumstances, a reasonable person would not feel free to end the interrogation by the police and leave." *United States v. Hoyer*, 411 F. Supp. 3d 406, 408 (W.D. Ky. 2019). Interrogation includes both express questioning, as well as "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response[.]" *Id.* at 409 (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980). However, "[g]eneral on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process is not" interrogation within the meaning of *Miranda*. 384 U.S. at 477. The Court considers several factors in assessing the nature of challenged questioning,

> including (1) the location of the interview; (2) the length and manner of the questioning; (3) whether there was any restraint on the individual's freedom of movement; and (4) whether the individual was told that he or she did not need to answer the questions.

*United States v. Hinojosa*, 606 F.3d 875, 883 (6th Cir. 2010). A party seeking suppression of statements based on a *Miranda* violation is required to show by a preponderance of the evidence that he was subject to custodial interrogation. *United States v. Lawrence*, 892 F.2d 80 (Table), 1989 WL 153161, at *5 (6th Cir. 1989).

The parties do not dispute that Molina was not read his *Miranda* warnings at any point. Nor do the parties contest custody. In fact, while not dispositive, Detective Cobb testified that Molina was detained. [June 8 Tr. at 64–65]; *see Stansbury v. California*, 511 U.S. 318, 323 (1994). The facts support the conclusions of the parties and Detective Cobb. Despite being in his own home, law enforcement and emergency presence was substantial. [June 8 Tr. at 13, 38]. Molina was the only non-law-enforcement, unimpaired, and coherent individual in the home at that time.

14

Moreover, even though no weapons were displayed during the encounter, the officers' actions in forcibly restraining Molina, even if only momentarily, to remove his phone from his control were intimidating. [*See* DE 85-1 at Page ID # 378 (affirming that "Officer Grider had to forcibly detain Molina and remove one of the cell phones from him as he began deleting text messages from the phone")]. These circumstances weigh in favor of a custody finding, despite the location being Molina's home. *See United States v. Panak*, 552 F.3d 462, 466 (6th Cir. 2009) (noting that "[e]ven when an interrogation takes place in the familiar surroundings of a home, it still may become custodial without the officer having to place handcuffs on the individual" and observing that the number of officers present is an important factor); *United States v. Mitchell*, 161 F. App'x 537, 540 (6th Cir. 2006) (finding that, where four officers conducted a traffic stop of two individuals, "the quantity of officers involved in the stop would certainly have been intimidating to a reasonable person" and contributed to transforming the otherwise innocuous encounter into a *Miranda* situation). A reasonable person in Molina's shoes would not have felt he could usher the police out as he chose. *Cf. Coomer v. Yukins*, 533 F.3d 477, 487 (6th Cir. 2008) (acknowledging that "perhaps most significantly" the officer had advised the defendant "several times that she was not under arrest and that the police would leave if asked").

However, despite the custodial nature of the encounter, there is no evidence whatsoever that Molina was subject to custodial *interrogation* under *Miranda*. All questioning was calm, casual, and in no way prolonged or in-depth. *Hinojosa*, 606 F.3d at 883. More importantly, the officers simply asked Molina routine, on-the-scene questions about the events leading up to the suspected overdoses, such as who lived at the house, how many people were on-scene, and what the apparently overdosing individuals had taken. The nature of any questioning reflected per the

testimony and footage was relaxed, with Molina at times paying only partial attention to the officers' routine questions as he talked on the phone and appeared blatantly distracted. [*See, e.g.*, DE 108]. This general factfinding questioning from various officers at various points—all ostensibly to discern how to address the exigent circumstances—is far from the sustained, police-dominated "interrogation" that *Miranda* feared. *See Hoffner v. Bradshaw*, 622 F.3d 487, 512 (6th Cir. 2010) (emphasizing that on-the-scene questioning is exempt from the *Miranda* requirement and concluding that "the police did not need to give [the defendant] Miranda warnings upon entering [his] house in order to ask basic investigatory questions"); *see also Garcia v. Singletary*, 13 F.3d at 1487, 1491 (11th Cir. 1994) (concluding that an officer conducting brief investigatory questioning of an inmate about the origin of a fire that he started "was a spontaneous reaction to a startling event" and not interrogation under *Miranda*). This is perhaps the atypical case where an individual was significantly restricted in his freedom of movement and would not have reasonably felt he could depart and terminate the encounter altogether, but also questioned so briefly and casually about basic on-scene events that he *would* have reasonably felt that he could terminate *questioning* at any time. *Cf. United States v. Phillips*, No. 08-96-GFVT, 2009 WL 4571844, at *12 n.5 (E.D. Ky. Dec. 1, 2009) (observing that on-the-scene questioning "generally" occurs in a noncustodial environment).

For these reasons, the Court finds that Molina has not shown by a preponderance of the evidence that he was subject to custodial interrogation or that he made any statements under such circumstances. The Court recommends that the District Judge reject Molina's *Miranda* arguments and deny suppression of the at-issue statements made on January 19th, whatever those statements may have been.

C.    **T**HERE **W**AS **P**ROBABLE **C**AUSE FOR THE **J**ANUARY 19TH **R**ESIDENTIAL **S**EARCH **W**ARRANT, AND, **R**EGARDLESS, THE **G**OOD **F**AITH **E**XCEPTION **P**RECLUDES **S**UPPRESSION.

"[P]robable cause exists under the Fourth Amendment 'when there is a fair probability, given the totality of the circumstances, that contraband or evidence of a crime will be found in a particular place.'" *United States v. Perry*, 864 F.3d 412, 415 (6th Cir. 2017) (quoting *United States v. Brown*, 732 F.3d 569, 573 (6th Cir. 2013)).  The Court's review is limited to considering whether the issuing judge "had a substantial basis for finding that the affidavit established probable cause to believe that the evidence would be found at the place cited[.]"  *Id.* (quoting *Brown*, 732 F.3d at 573).

The Court must give great deference to the issuing judge's probable cause determination. *Id.*  The Court's assessment is further restricted "to the information presented in the four corners of the affidavit[,]" and the Court must judge the affidavit "based on the totality of the circumstances, rather than line-by-line scrutiny[.]"  *United States v. Jackson*, 470 F.3d 299, 306 (6th Cir. 2006).  Moreover, "[t]he affidavit is judged on the adequacy of what it does contain, not on what it lacks, or on what a critic might say should have been added."  *United States v. Allen*, 211 F.3d 970, 975 (6th Cir. 2000).  The Court ultimately considers all facts presented in the affidavit, collectively, "through the 'lens of common sense[.]'"  *United States v. Christian*, 925 F.3d 305, 309 (6th Cir.), *cert. denied*, 140 S. Ct. 414 (2019) (quoting *Florida v. Harris*, 568 U.S. 237, 244 (2013)).

To establish probable cause for a residential search warrant, as here, "the supporting affidavit must set forth 'a nexus between the place to be searched and the evidence sought.'" *United States v. Penney*, 576 F.3d 297, 311 (6th Cir. 2009) (quoting *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004)).  *See also United States v. Jenkins*, 743 F. App'x 636, 642 (6th

17

Cir. 2018) (citing *United States v. Van Shutters*, 163 F.3d 331, 337 (6th Cir. 1998) and observing that there must be a "nexus between the premises and the criminal activity"). "This belief that the items sought will be found at the location to be searched may be supported by less than prima facie proof but [requires] more than mere suspicion." *Id.* (internal quotation marks omitted).

Here, the affidavit in support of the search warrant detailed numerous facts establishing probable cause of drug activity inside the Ormesby Place residence and that fruits or instrumentalities of such crimes would be found there. [*Id.* at Page ID # 377–79].

First, critically, the three overdoses that occurred inside of the residence on January 19—requiring Narcan revival—strongly indicated that narcotics use was occurring at the home on that specific date. *See, e.g.*, *United States v. Stewart*, 761 F. App'x 659, 662 (8th Cir. 2019) (finding probable cause for a search warrant where, among other things, an individual "had suffered a non-fatal overdose at the residence"); *United States v. Galloway*, No. CR 19-10162-DJC, 2020 WL 4369648, at *3 (D. Mass. July 30, 2020) (finding probable cause for a residential search warrant where a suspected drug overdose had occurred).[7]

Second, the affidavit referenced the various indicators of suspected drug trafficking that officers found at the residence during the protective sweep. Detective Cobb affirmed that, per his training and experience, the collection of trash inside of a residence in this manner frequently indicated both the bulk packaging of narcotics and a desire to prevent police from rifling through

---

[7] Despite Molina's references to Kentucky's Good Samaritan Law, KRS § 218A. 133, it has no applicability in this context. The law prevents only Kentucky prosecutions of drug *possession* offenses. By its terms, it does not apply to other offenses, such as drug trafficking. *See* KRS § 218A.133(3). Moreover, it applies to state criminal prosecutions, not preliminary investigative techniques such as state search warrants. And, as the state law in no way binds the federal government or limits its prosecutorial or investigative reach, it does not bar the instant case. The overdose information was highly relevant to the issue of probable cause and properly included in Detective Cobb's search warrant affidavit. The Good Samaritan law has no relevance here.

the discarded items, further suggesting unlawful activity. *See United States v. Schultz*, 14 F.3d 1093, 1097 (6th Cir. 1994) (emphasizing the value of an officer's training and experience in establishing probable cause). This conclusion is bolstered by the gloves found in the open trash bag in the kitchen, which matched the full box of gloves found in the kitchen. Additionally, officers located an industrial tape gun, which could be used for large-scale drug packaging. Though individually offering little, these items collectively indicate that the Ormesby Place residents had been preparing and packaging drugs and attempting to conceal the remnants.

Third, the affidavit referenced actual narcotics found in the home, *i.e.*, "marijuana in plain view[,]" as was found by Officer Saylor and Sergeant Jared. [DE 85-1 at Page ID # 378]. Detective Cobb also noted the smell of burnt marijuana inside of the residence. Further, as indicated in the affidavit, neighbors corroborated the smell of marijuana frequently emanating from the home. The affidavit also noted that the table in the dining room—by which one of the overdose victims was lying—appeared to have been recently wiped down, with wet streaks still visible. Detective Cobb additionally mentioned that, upon his canvassing of the area, neighbors complained of come-and-go traffic targeting the residence. *See United States v. Peterson*, 840 F. App'x 844, 849 (6th Cir. 2021) (observing that "short-term visits" to a house are "consistent with drug-trafficking activity").

Fourth, multiple cell phones and the "large quantity of cash" discovered on Molina's person on the afternoon of January 19th are indicative of trafficking activity. [DE 85-1 at Page ID # 378]. *See, e.g., United States v. Brooks*, 594 F.3d 488, 495 (6th Cir. 2010) (noting that "[c]ourts have readily acknowledged that large sums of cash are indicative of the drug trade").

19

Fifth, officers also noted that there were two security cameras outside of the residence and a mounted trail camera at the entrance to the neighborhood, several houses down from Molina's home.  Consistent with his training and experience, Detective Cobb noted in context that off-site security cameras are frequently used near drug traffickers' homes.

Sixth, Detective Cobb also mentioned in the affidavit that Molina and Corrales both had prior narcotics charges and other criminal convictions.  Specifically, Molina—who admitted to officers that he lived at the residence—"had several narcotics trafficking charges, including trafficking fentanyl, and served [a] federal prison sentence in the past."  [DE 85-1 at Page ID # 378].  These prior charges and convictions provide additional context for the materials found at the home and the overdose situations, making it more likely that the materials were trafficking-related and that the individuals had, in fact, overdosed on fentanyl (or a similar narcotic substance). *See United States v. Dyer*, 580 F.3d 386, 392 (6th Cir. 2009) (explaining that, though not dispositive, criminal history is "relevant" to the issue of probable cause, and it is appropriate to "take into account predilections revealed by past crimes or convictions as part of the inquiry").

In the end, none of these facts *alone* necessarily creates probable cause for the search warrant.  Yet, taken in the aggregate, these facts certainly indicate drug use and trafficking at the residence.  Evaluating the collective whole of these facts through a commonsense lens, as the Court must, it is apparent that probable cause existed to search the residence.  The Court recommends that the District Court deny suppression of the results of the search.

Even if the District Court were to determine probable cause did not exist, it is abundantly apparent that the good faith exception would nonetheless save the search and preclude suppression. Where a reviewing court determines that the affidavit did not establish probable cause, it should

20

not apply the exclusionary rule and suppress the resulting evidence if it was "seized in reasonable, good-faith reliance on a search warrant that is subsequently held to be defective." *United States v. White*, 874 F.3d 490, 496 (6th Cir. 2017) (quoting *United States v. Leon*, 468 U.S. 897, 905 (1984)). "Following *Leon*, courts presented with a motion to suppress claiming a lack of probable cause must ask 'whether a reasonably well trained officer would have known that the search was illegal despite the'" issuing judge's blessing. *Id.* (quoting *United States v. Hodson*, 543 F.3d 286, 293 (6th Cir. 2008)).

This standard is easily met in this case. Given the overdosing individuals present at the Ormesby Place house on January 19, the suspected trafficking supplies found there, and the actual narcotics discovered during the earlier protective sweep, there is a substantial connection between the suspected drug activity and the residence. This connection certainly provides the minimum modicum of evidence that fruits of drug crimes would be found at the home. Moreover, given the level of recent (same-day) factual detail provided in Detective Cobb's affidavit and the judge's approval of the warrant, officers reasonably viewed the affidavit as well beyond "bare bones" and undoubtedly executed the authorized search in good faith. The Court recommends that, even if probable cause is ultimately deemed lacking, the District Judge find that the good faith exception applies and deny suppression on that alternative and independent basis.

**D.    MOLINA LACKS STANDING TO CHALLENGE ANY SEARCH OF MORALES'S PHONE.**

Lastly, the Court briefly addresses Molina's argument for suppression of evidence found on the various cell phones seized on January 19th. As a threshold matter, the Court observes that the Government demonstrated—through Special Agent Moore's credible and uncontested testimony—that the sole evidence utilized by the DEA from the cellebrite reports was confirmation that a number provided by Molina in the fall of 2020 was also associated with Molina in the

cellbrite reports.  [June 11 Tr. at 5–10].  Namely, the number was listed in the contact information for Molina on the phone belonging to Morales.  Consequently, the evidence, even if wrongfully seized, has no impact or relation to the current pending charges.

Moreover, Molina does not have standing to contest the use of information seized from Morales.[8]  Molina has neither asserted nor demonstrated any ownership or possessory interest in any of Morales's cell phones.  "[B]ecause Fourth Amendment rights are personal, suppression of evidence as the product of a Fourth Amendment violation can be successfully urged only by those whose rights were violated by the search itself, not by those who are aggrieved solely by the introduction of damaging evidence."  *United States v. Powell*, 847 F.3d 760, 768 (6th Cir. 2017) (quotation marks omitted).  Critically, a person "with no possessory interest" in property has no standing to challenge the search of that property on Fourth Amendment privacy grounds.  *United States v. Bah*, 794 F.3d 617, 626 (6th Cir. 2015); *see also United States v. Brewer*, 708 F. App'x 96, 99 (3d Cir. 2017) (finding that a defendant who lacked "ownership and control of the phone" ultimately searched did not have any privacy expectation in its contents and, thus, lacked standing to challenge the search).

Accordingly, even if the cellbrite report had independent evidentiary value and itself contributed to any later fruits—and, the record is clear that it did not—Molina would nonetheless lack standing to challenge the search or search warrant pertaining to it.  The Court thus recommends that the District Judge deny Molina's motion to the extent it seeks suppression of any referenced cell phone evidence.

---

[8] Molina has advanced no argument for suppression of any content found on his own phones that were seized on January 19.  Nor does the record indicate that any incriminating content was discovered on them in this investigation.

### III.    <u>CONCLUSION</u>

For all of the reasons discussed, the Court **RECOMMENDS** that the District Court **DENY** Molina's suppression motion [DE 85].  The Court directs the parties to 28 U.S.C. § 636(b)(1) for appeal rights concerning this recommendation, issued under subsection (B) of the statute. Given the impending trial date and per the parties' agreement, **<u>within seven days</u>** after being served with a copy of this recommended decision, any party may serve and file written objections to any or all portions for consideration, *de novo*, by the District Court.

Entered this the 18th day of June, 2021.



Signed By:
<u>Matthew A. Stinnett</u>
United States Magistrate Judge

23