UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Lexington)

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| Plaintiff, | ) | Criminal Action No. 5: 20-128-DCR |
| V. | ) | |
| RUBEN A. MOLINA, | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| Defendant. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

Defendant Ruben Molina has filed a motion to exclude all evidence seized pursuant to a search of his residence on January 19, 2020, and a subsequent search of a cell phone seized from his co-defendant, Nathanael Morales. [Record No. 85] The motion was referred to United States Magistrate Judge Matthew A. Stinnett for issuance of a Report and Recommendation ("R & R") pursuant to 28 U.S.C. § 636(b)(1)(B). Magistrate Judge Stinnett held evidentiary hearings on June 8, 2021, and June 11, 2021. On June 18, 2021, he issued a R & R indicating that Molina's motion to suppress should be denied. [Record No. 115] Molina has filed objections to the R & R.[1] [Record No. 118] Following careful review of the matter, the Court will deny the motion to suppress.[2]

---

[1]   Molina filed a motion to enlarge the time for filing objections, as he filed them a day late. [Record No. 119] Counsel for Molina indicates that, when finalizing the brief, she discovered authority that had not been cited previously and was "overtaken by the late hour." While it appears this issue could have been avoided by better planning, the modest extension will be granted.

[2]   Although this Court must make a *de novo* determination of those portions of the Magistrate Judge's recommendations to which timely objections are made, 28 U.S.C. § 636(b)(1)(C), "[i]t does not appear that Congress intended to require district court review of a

## I.

Defendant Ruben Molina called 9-1-1 on January 19, 2020, reporting that multiple individuals had overdosed at his residence at 3861 Ormesby Place in Lexington, Kentucky. Emergency responders were already on scene when Lexington Police Officer Rebecca Saylor arrived. [Record No. 116, p. 90] Saylor observed two individuals, later identified as Ruben Corrales and Ulises Duarte, who appeared to be under the influence of drugs, being assisted by emergency response personnel.[3] Molina denied knowing what substance the individuals had taken. After receiving Molina's permission to "check [the] bathrooms and stuff," Saylor found suspected marijuana in a bathroom near the living room where one of the overdosed individuals was sitting.

Lexington Police Sergeant Brian Jared arrived shortly thereafter. Upon entering the house, Jared saw a large industrial tape gun laying in the doorway. And inside the foyer he observed a large industrial trash bag with used rubber or latex gloves laying on top of the trash. There was also a "nook" or "mini office" in the kitchen which contained a large box of latex gloves. *Id.* p. 18.

Molina, who was sitting at the kitchen table, explained that he had gone out to pick up breakfast and the individuals were non-responsive when he returned. Officers were skeptical of this story because there were multiple partially-eaten plates of food from a First Watch restaurant on the kitchen island. *Id.* pp. 20, 43. Molina denied knowledge of any narcotics

---

magistrate's factual or legal conclusions, under a *de novo* or any other standard, when neither party objects to those findings." *Thomas v. Arn*, 474 U.S. 140, 150 (1985).

[3]     A third overdosed individual, Defendant Nathanael Morales, was transported to the hospital. [Record No. 116, p. 39]

use even though the overdose victims were revived with Narcan, which is only effective for opioid usa/abuse. *Id.* p. 48-49.

Jared asked the other officers on the scene to "make sure that there's nobody else in [the] house, upstairs, downstairs, or on the main level that's down or overdosed." Sergeant Jared explained at the suppression hearing that he was concerned about additional overdose victims or possibly leaving a child unattended in the house. Jared himself went to the basement to check for other individuals. In the basement, he noticed smoked marijuana blunts laying in plain view, as well as a large pile of trash in the corner.[4] *Id.* p. 16.

Officers also observed that Molina had three cell phones on his person. At some point, Lexington Police Officer Chaz Grider forcibly detained Molina and removed one of the cell phones from him as he began deleting text messages from the phone. *Id.* p. 46. Based on the circumstances and items observed, Jared notified Detective Brian Cobb of the Lexington Police Department's narcotics enforcement unit. *Id.* at 22. Cobb testified that he smelled the odor of burnt marijuana upon entering the house. Jared showed Cobb the suspected marijuana located by Officer Saylor, as well as the tape gun, large trash bag, and latex gloves in the kitchen area. Cobb also observed streaks on a dining room table that appeared to have recently been wiped down with a wet rag. *Id.* p. 43. Cobb noted that one of the overdose victims was lying next to this table.

Additionally, Cobb observed two security cameras on the exterior of the house—one above the front entry door and one above the garage doors. Officers also located a wireless,

---

[4] Jared also performed a sweep of the upstairs. He explained that the house was very large and he was not able to confirm with the other officers which rooms had already been checked.

motion-activated trail camera mounted in a tree in the median several houses down from Molina's residence. Detectives learned through police databases that Molina had several previous narcotics trafficking charges, including trafficking in fentanyl, and had served a federal prison sentence in the past. Additionally, Ruben Corrales had prior charges for trafficking narcotics including marijuana and cocaine. *Id.* p. 49.

Based on all of these facts, Cobb applied for and received a search warrant for the residence. On execution of the search warrant, officers recovered approximately 14 pounds of marijuana edibles and evidence of drug trafficking, including seven cell phones. *Id.* p. 52. On January 19, 2020, Molina was charged in the Fayette Circuit Court with trafficking in marijuana, greater than five pounds, and possession of drug paraphernalia. *See* Case No. 20-CR-328-001. Molina posted bond and was released the following day.

On January 21, 2020, law enforcement obtained search warrants for each of the phones that had been seized from Molina's residence and a Cellebrite report was prepared for each phone.[5] [Record No. 113] The phones had little information that was useful to law enforcement, although one of Morales' phones contained contact information for "Ruben," which was later linked to Defendant Molina during a controlled buy of methamphetamine. [Record No. 117, p. 6]

Drug Enforcement Administration Special Agent Jason Moore testified regarding the federal investigation of Molina's alleged drug trafficking activities. According to SA Moore, the DEA received information in late 2019 that Molina was involved in drug trafficking. [Record No. 117, p. 3] Moore was not present at and had no association with the execution of

---

[5] Two of the phones belonged to Molina and five of the phones belonged to Nathanael Morales.

the search warrant at Molina's residence on January 19, 2020. Moore explained that Molina's instant charges for methamphetamine trafficking arose out of the DEA's investigation utilizing a cooperating confidential source ("CS"). Specifically, Molina contacted the CS *via* Facebook Messenger on or about October 28, 2020, and asked the CS for a telephone number at which he could be contacted. Agents provided the CS with a telephone number, which the CS gave to Molina. Molina then contacted the CS using a telephone number that was ultimately connected with Molina based, in part, on the contact information from one of Morales' phones seized on January 19, 2020. *Id.* pp. 6, 10.

Molina was arrested in November 2020 and charged by a criminal complaint based on the DEA's investigation of his alleged drug trafficking activities. Later that month, a federal grand jury returned an indictment charging Molina and Corrales with conspiring to distribute methamphetamine. [Record No. 8] In March 2021, a federal grand jury returned a superseding indictment charging Molina, Corrales, and Morales with conspiring to distribute methamphetamine and cocaine; Molina and Corrales with possessing with intent to distribute marijuana; and Molina and Corrales with distributing methamphetamine.

## II.

The magistrate judge has recommended that the undersigned deny Molina's motion to suppress on alternate grounds. First, he determined that the evidence was procured properly and legally. Second, as the magistrate judge observed, Molina did not demonstrate how the evidence he seeks to suppress is relevant to his current prosecution.[6]

---

[6]  It appears that the marijuana seized from Molina's residence on January 19, 2020, is relevant to Count 2 of the Superseding Indictment—possession with intent to distribute marijuana. However, the defendant did not raise this issue in his objections to the R & R and it is not relevant for purposes of the Court's analysis.

### A. Officer Saylor's Search of the Bathroom

Molina's first objection concerns Officer Saylor's search of the bathroom. He contends that Saylor was permitted to "conduct a quick sweep" of the bathroom and nothing more. However, there is nothing about the circumstances leading up to Saylor's search of the bathroom or Molina's conduct during or after the search that supports this argument. Instead, Saylor sought Molina's permission to search or "check" the bathroom and he consented. *See United States v. Lucas*, 640 F.3d 168, 174 (6th Cir. 2011) (observing that Fourth Amendment permits warrantless search when valid consent is given).

The scope of consent is determined by examining how a reasonable person would have understood the conversation between the officer and the defendant when consent was given. *See, United States v. Gant*, 112 F.3d 239, 242-43 (6th Cir. 1997) (citing *Florida v. Jimeno*, 500 U.S. 248, 251-52 (1991)). Generally, the expressed object of a search defines the scope of consent unless the person giving consent expressly limits the scope. *Id*. at 243.

Immediately before seeking Molina's consent to "check" the "bathrooms and stuff," Saylor was questioning Molina in an attempt to determine what substance Corrales and Duarte had taken. But Molina claimed to have no knowledge of what substance his houseguests had ingested. Saylor explained to Molina that overdose victims can be treated more effectively when medical personnel know what substance they have taken. The obvious implication from the conversation was that Saylor's goal in searching the bathroom was to attempt to ascertain the identity of the substance or substances. During the search, Molina walked into the doorway of the bathroom and, when asked about the marijuana, explained that his sister ordinarily used this bathroom. At no point did he withdraw consent or object to what Saylor was doing.

Finally, while Molina contends that "check" and "search" are distinct acts, he has not provided any authority supporting this proposition. *But see United States v. Rios*, 2011 WL 4912074, at *4 (11th Cir. Oct. 17, 2011) (concluding that defendant's consent to having officers "check" his hotel room would cause a reasonable police officer to believe that defendant was allowing him to search for narcotics inside drawers, luggage, and other containers). Saylor's body camera footage revealed that Molina calmly observed without objection as she searched the bathroom after receiving his permission to do so. Molina's *post hoc* assertion that she exceeded the scope of the permissible search is without merit.

### B. The Search Warrant

#### 1. The Search Warrant was Supported by Probable Cause

Molina challenges the magistrate judge's finding that there was probable cause to support the search warrant for his home. In so doing, he highlights the weaker facts relied upon in the affidavit in support of the search warrant, to wit: the presence of latex gloves that could have been the same kind worn by EMTs; streaks on a table that might simply be an indication of a normal cleaning; and security cameras that are "not uncommon in modern homes." [Record No. 118, p. 5] However, the defendant presents these facts in isolation while ignoring many compelling facts indicative of drug trafficking, which are all set forth in the application for the search warrant.

Probable cause exists when there is "a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Berry*, 565 F.3d 332, 338 (6th Cir. 2009) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). The Court looks within the four corners of the affidavit supporting the search warrant request to determine whether probable cause exists. *United States v. Jackson*, 470 F.3d 299, 306 (6th Cir. 2006). Such an affidavit

must indicate "a nexus between the place to be searched and the evidence sought." *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004).

Detective Cobb's application for a warrant to search Molina's residence was robust and included the following facts: Officers responded to an emergency call at the residence where multiple overdose victims had been revived with Narcan. Molina told officers that he had left the residence to pick-up breakfast and returned to find the victims lying in the floor. However, the officers observed a bag of food and several partially-eaten plates of food on the counter, clearly indicating that the events did not occur as the defendant claimed.

During a security sweep of the residence, officers observed marijuana in plain view, as well as latex gloves in the trash and a box of latex gloves in the office. Officers also observed a packaging tape dispenser and multiple bags of trash that were collected inside the residence and not disposed of in exterior trash cans. In Cobb's experience, these items and techniques are common in narcotics trafficking.

Cobb also reported that he smelled the odor of burnt marijuana upon entering the house. Molina denied having any knowledge of opioids, despite the overdosed individuals having been revived with Narcan. Cobb also indicated that he observed streaks on the dining table "consistent with someone wiping the table to discard narcotics." He noted that one of the overdose victims was located lying next to the table and the other two were located in close proximity to it.

Cobb noted the presence of security cameras on the exterior of the residence, as well as in a tree in the median down the street from Molina's house. Cobb commented that such cameras are commonly used for surveillance to observe any traffic to and from the residence. Sergeant Jared conducted a canvass of the neighborhood and several neighbors complained of

come-and-go traffic and the odor of marijuana emanating from the residence. Officers also advised that Molina had three cell phones in his possession and a large amount of cash. At one point, Officer Grider had to forcibly remove a cell phone from Molina because he began deleting text messages.

Finally, the application for the search warrant noted that Molina has several previous charges for trafficking narcotics, including fentanyl, and has served a federal prison sentence in the past. Defendant Ruben Corrales also had prior charges for trafficking narcotics, including marijuana and cocaine

A police request to search for drugs need only show a fair probability that drugs will be found in the place to be searched. *United States v. Abernathy*, 843 F.3d 243, 249 (6th Cir. 2016) (citations omitted). An affidavit in support of a search warrant should be viewed in its totality and through a lens of common sense. *United States v. Williams*, 544 F.3d 683, 685 (6th Cir. 2008). The affidavit in this case easily satisfies the threshold showing of a fair probability that evidence of drug trafficking would be found at Molina's residence.

### 2. The Good Faith Exception Would Apply

The search warrant is supported by probable cause—and this is not a close question. The magistrate judge concluded that, even if probable cause did not exist, the good-faith exception to the exclusionary rule would apply. This rule provides that courts should not suppress "evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant." *United States v. Leon*, 468 U.S. 897, 922 (1984).

In his objections to the R & R, Molina contends that the good faith exception does not apply, "as officers could not reasonably rely on the warrant as requested to support a search." [Record No. 118, p. 6] Molina concedes that the affidavit went beyond "bare bones," but

argues for the first time that "a well-trained officer, like Detective Cobb, would have known that the facts as they actually were would not support a finding of probable cause despite the judge's decision to grant the warrant on the facts present in its support." *Id.*

Molina circles back to the same arguments he used to attack the sufficiency of the search warrant—that the streaks on the table were innocuous and the latex gloves in the trash could have been discarded by emergency personnel. Essentially, Molina suggests that Officer Cobb knowingly made misleading statements by including these in the search warrant application. However, Cobb testified during the suppression hearing that he personally observed water marks on the dining room table indicating that it had recently been wiped down with something wet. Since one of the overdose victims was lying next to this table, he believed it was consistent with someone wiping the table to discard narcotics. To the extent Sergeant Jared offered conflicting testimony that a "living room table" had been wiped down, he also expressed difficulty remembering, saying the incident had taken place more than a year and half ago.

Counsel for the defendant cross-examined Detective Cobb concerning the latex gloves during the suppression hearing. Counsel attempted to suggest that the latex gloves on top of the trash were discarded by first responders rather than the defendant or his guests. However, Cobb explained that the gloves were already in the trash prior to any medical personnel leaving the scene. Additionally, there was no suggestion that the box of latex gloves in the office nook belonged to first responders. If the defendant kept a box of latex gloves in his kitchen, it was reasonable for Cobb to believe that the discarded pair of gloves in the trash were the defendant's.

Molina certainly has not demonstrated by a preponderance of the evidence that Detective Cobb recklessly or intentionally made a materially false statement in the application for the search warrant. *See United States v. Elkins*, 300 F.3d 638, 649 (6th Cir. 2002) (citing *Franks v. Delaware*, 438 U.S. 154 (1978)). Further, even if the two challenged items were excised from the affidavit, there was still probable cause to search the premises based on the many other indicia of drug trafficking, including the marijuana and multiple trash bags inside the residence, the surveillance cameras, neighbors' reports of come-and-go traffic, and the defendants' history of drug trafficking offenses. *See United States v. Campbell*, 878 F.2d 170 (6th Cir. 1989). Simply put, these arguments are totally lacking in merit.

### C. Information From Morales' Phone

As previously stated, officers seized several cell phones from Molina's residence and subsequently obtained warrants to search the phones themselves. The Assistant United States Attorney advised the magistrate judge at the beginning of the suppression hearing that there was "no information of any investigative value" recovered from the seized cell phones. [Record No. 116, p. 3] Detective Cobb testified at the suppression hearing that there was nothing of evidentiary value recovered from the three phones seized from Molina. *Id*. pp. 46-47.

While there is no indication that Molina's phones contained any useful evidence, DEA SA Jason Moore's testimony indicates that one of Morales' phones might have. Moore explained that on or about October 28, 2020, Molina contacted a cooperating source *via* Facebook Messenger. Molina asked the CS to provide a telephone number at which he could be contacted. Agents provided the CS with a telephone number, which the CS gave to Molina.

Molina then contacted the CS using a telephone number that was ultimately recovered from Morales' seized phone as "Ruben."

The magistrate judge ultimately concluded that Molina did not have standing to challenge the search of Morales' phone. Molina objects to that finding, arguing that Morales' phone constitutes fruit of the poisonous tree because it was seized during an illegal search of his home. But as previously explained, the search of Molina's home was proper and the magistrate judge correctly concluded that Molina does not have standing to challenge the search of Morales' phone.

### D. Good Samaritan Law

Kentucky law provides exemption from prosecution for possession of a controlled substance or drug paraphernalia for individuals who, in good faith, request medical assistance for the victim of a drug overdose and remain with the overdose victim until the requested assistance is provided. K.R.S. § 218A.133. In his objections to the R & R, Molina suggests that the evidence seized from his residence on January 19, 2020, should be excluded based on Kentucky's Good Samaritan Law. However, this statute has no impact on Molina's charges in this Court.

First, as the magistrate judge observed, the statute creates immunity from state prosecution for simple possession and does not immunize defendants from being prosecuted for other crimes such as trafficking. Notably, it does not create an exclusionary rule for evidence gathered during police investigations. In keeping with the plain language of the statute, the Court of Appeals of Kentucky has confirmed that exclusion of evidence is not a remedy under the Good Samaritan Law. *Com. v. Milner*, 2019 WL 5280800 (Ky. Ct. App. Oct. 18, 2019). While the Supreme Court of Kentucky has granted discretionary review in

*Milner*, it appears the only issue presented is whether the defendant qualifies for exemption from prosecution under § 218A.133 when he did not actually overdose and did not need medical assistance. Whether suppression is an available remedy under the Good Samaritan Law is not at issue.[7]

But more importantly, Kentucky law does not apply to the proceedings against Molina in this Court. *See United States v. Wright*, 16 F.3d 1429, 1434 (6th Cir. 1994) (the fact that a state law may "require greater protection against searches and seizures than the fourteenth amendment is of no avail to a defendant in federal court, under prosecution for a federal crime"). This Court applies Fourth Amendment jurisprudence, not state law, to determine whether evidence should be suppressed in a criminal proceeding. *See id*. Molina has not identified any valid reason that the evidence seized from his residence should be suppressed in this case.

### III.

Based on the foregoing, it is hereby

**ORDERED** as follows:

1. The defendant's motion for an extension of time to file objections to the Report and Recommendation [Record No. 119] is **GRANTED**.

2. The magistrate judge's Report and Recommendation [Record No. 115] is **ADOPTED** and **INCORPORATED** here in full.

3. The defendant's motion to suppress [Record No. 85] is **DENIED**.

---

[7] *See* C-Track Public Access, Kentucky Supreme Court, Case no. 2019-SC-0660, *Milner v. Com.*, https://appellatepublic.kycourts.net/case/a33219b4a582c90dba9153addfd21eaf906b2e8edd7492449d24cbc44cefb43f (last accessed June 29, 2021).

Dated: July 1, 2021.

Danny C. Reeves, Chief Judge
United States District Court
Eastern District of Kentucky